[Crim. No. 9534. Second Dist., Div. One. Aug. 2, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JEROME REHMAN et al., Defendants and Appellants.

Ramsey & Emlein, A. L. Wirin, Fred Okrand and Albert C. S. Ramsey for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

KINCAID, J. pro tem.*—The appellants Jerome Rehman, Mark Sincoff, Richard Alfred Gorman and Charles Edwin Symes, with several others, were accused by the Grand Jury of Los Angeles County, on June 14, 1962, in a two-count indictment. The case went to jury trial only as to amended count two charging appellants with the crime of conspiracy, in violation of section 182, Penal Code of California, a felony, in that they did wilfully, unlawfully and feloniously conspire and agree together, and with other persons, to commit acts injurious to the public health and to violate sections 240 (assault), 242 (battery) and 484 (theft) of the Penal Code, 2141 (practicing healing arts without a license) and 650 (unlawful splitting of fees, etc.) of the Business and Professions Code, 556 (fraudulent claim under insurance contract) of the Insurance Code, 10675 (fraudulent birth certificate) and 1417 (licensing provisions and adopted rules and regulations as to hospitals) of the Health and Safety Code and of the rules promulgated by the State Department of Health as contained in title 17, Administrative Code.

Sixteen overt acts were also alleged as a part of count two.[1]

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

[1] "Overt Act No. 1. That on or about the month of December, 1961, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant CHARLES EDWIN SYMES had a conversation with C. Robert Hastings and John J. Sanford regarding splitting of fees for patients referred to the Bixby Knolls Community Hospital by the said C. Robert Hastings and John J. Sanford.

"Overt Act No. 2. That on or about February, 1961, to April, 1962, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy and agreement, and to accomplish its objects and purposes, said defendant CHARLES EDWIN SYMES, at the Bixby Knolls Hospital subjected various patients to excessive X-ray exposures.

Penal Code of California, section 182, provides: "If two or more persons conspire: 1. To commit any crime. . . . 5. To commit any act injurious to the public health, to public morals, or to permit or obstruct justice, or the due administration of the laws. . . . They are punishable as follows: . . ."

"Overt Act No. 3. That on about January, 1961, to June, 1962, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy and agreement, and to accomplish its objects and purposes, said defendant RICHARD ALFRED GORMAN, administered anesthesia to patients during surgery at the Bixby Knolls Community Hospital.

"Overt Act No. 4. That on or about January, 1961, to June, 1962, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant RICHARD ALFRED GORMAN, sutured patients after surgery at said hospital.

"Overt Act No. 5. That on or about January, 1961, to June, 1962, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant RICHARD ALFRED GORMAN, gave hypodermic injections to patients in said hospital.

"Overt Act No. 6. That on or about December 26, 1961, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant JEROME REHMAN, permitted Bernard Steuber to deliver the child of Myna M. Schofield at the Bixby Knolls Community Hospital.

"Overt Act No. 7. That on or about February 17, 1962, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant JEROME REHMAN, permitted Alfred F. Libby to deliver the child of Mary Susan Lockwood at the Bixby Knolls Community Hospital.

"Overt Act No. 8. That on or about January 17, 1962, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant JEROME REHMAN, permitted M. C. Shaffer to deliver a child at the Bixby Knolls Community Hospital.

[Overt Act No. 9 was deleted by the court.]

"Overt Act No. 10. That on or about December 26, 1961, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant JEROME REHMAN, caused to be filed fictitious birth certificate for the child of Myna M. Schofield.

"Overt Act No. 11. That on or about February 17, 1962, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant JEROME REHMAN, caused to be filed a fictitious birth certificate for the child of Mary Susan Lockwood.

"Overt Act No. 12. That on or about January 21, 1962, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant JEROME REHMAN, did attempt to perform surgery upon Bobbie Doda at the said hospital for the purposes of making a claim upon an insurance company and Kenneth Eugene Doda when no such surgery was necessary.

A lengthy trial resulted in verdicts of guilty as to each defendant as charged in amended count two of the indictment. Motions for new trial were made and argued by each and were denied. Sentence followed, defendants remaining at liberty on bail. Each defendant appealed from the order made denying his motion for a new trial and from the judgment.

Defendants' evidence at trial was by way of denial of any unlawful act or intent, but on this appeal it seems apparent that they do not dispute the sufficiency of the evidence to support the judgment. They rely for reversal on the claimed prejudicial errors that: (1) Section 182, subdivision 5 of the Penal Code is so unconstitutionally vague as to fail to serve as a definition of criminal conduct; (2) it is not a crime to conspire to violate section 1417 of the Health and Safety Code; (3) special verdicts should have been submitted to the jury for determination; (4) evidence obtained pursuant to a

"Overt Act No. 13. That on or about March 7, 1962, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, James Vest had a conversation with said defendant MARK SINCOFF and said defendant JEROME REHMAN regarding his wife Peggy Ann Vest, who was in the Bixby Knolls Community Hospital, at 3833 Atlantic Avenue, Long Beach, California, wherein they urged that she remain in the said hospital for surgery, when no such surgery was necessary.

"Overt Act No. 14. That on or about March 7, 1962, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant JEROME REHMAN did attempt to perform surgery upon Peggy Ann Vest, at the said hospital, for the purpose of making a claim upon an insurance company, when no such surgery was necessary.

"Overt Act No. 15. That on or about November, 1961, at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy, and agreement, and to accomplish its objects and purposes, said defendant MARK SINCOFF asked Dr. Robert M. Lee to change consultation report on Sadie Johnson, who was a patient at the Bixby Knolls Community Hospital.

"Overt Act No. 16. That from January 1, 1961 to the date of the filing of this indictment in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy and agreement and to accomplish its objects and purposes said defendant JEROME REHMAN did submit claims and fraudently [sic] and feloniously took money from the United States Federal Government, the Dependents Medical Care program, Hospital Service of Southern California and California Physicians Service.

"Overt Act No. 17. That on or about May 26, 1962 at and in the County of Los Angeles, State of California, pursuant to said conspiracy, combination, confederacy and agreement and to accomplish its objects and purposes said defendant JEROME REHMAN did fraudently [sic] and feloniously detain AGNES CRAIGHEAD as a patient at the Bixby Knolls Hospital for a period of three days for the purpose of making a financial claim upon her and Hospital Service of Southern California when such detainment was not necessary."

search warrant and used at the trial violated their constitutional rights; (5) in instructing the jury regarding hypodermic injections; 6) excluding evidence. that certain witnesses had filed civil actions against defendants after testifying against them; (7) the testimony of prosecution expert witnesses that surgery or hospitalization of certain patients was in their opinion not indicated, and (8) the district attorney was guilty of misconduct in his investigation in that he turned satisfied patients into prosecution witnesses.

The reporter's transcript herein contains almost 22,000 pages of testimony and the evidence is, as succinctly as possible, summarized as follows:

Jerome Rehman is and since 1956 has been a licensed doctor of osteopathy. Thereafter, Rehman caused to be formed and had a controlling interest in various corporate and noncorporate enterprises among which were Metropolitan Enterprises, Incorporated, which owned and operated Bixby Knolls Community Hospital; Avalon Village Medical Clinic (unincorporated); Pacific Medical Clinic (unincorporated); Service X-Ray, a corporation which operated the X-ray section of Bixby Knolls Hospital; Harbor X-Ray Service, a corporation, which had charge of the X-ray services performed at Avalon Village Medical Group and Pacific Medical Clinic. It also owned Rainbow Ambulance Service; Metropolitan Medical Laboratories, Inc., which operated a clinical laboratory at Avalon Village Medical Clinic; HOAP, Incorporated, a nonprofit prepaid medical plan; Southwestern Acceptance Corporation, formed to act as a personal loan property broker and for the purchase of conditional sales contracts and other notes and obligations; Gerald Rentals, a corporation. organized to rent wheel chairs, crutches, hospital beds and similar equipment, and Purchasers Market. Incorporated, which was formed for the purpose of obtaining a license to sell wholesale drugs.

Mark Sincoff is an attorney licensed by the State of California. He acted as full time attorney for Rehman and his enterprises for a salary of $1,000 per month and $500 per month for expenses. He had an office at the Avalon Village Clinic. Sincoff was president of Metropolitan Enterprises, Incorporated, owner of the hospital. Either he, or Rehman, had the power to sign for any corporate purpose jointly with Mrs. Rehman who was secretary-treasurer. Corporate meetings for Metropolitan Enterprises, Incorporated, and for all the other corporations were usually held weekly. Sincoff was an

officer in Gerald Rentals, and was the president of Purchasers Market, Incorporated. He was vice-president of Harbor X-Ray. He listed himself on an application for a municipal license as president of Service X-Ray Corporation.

Sincoff went to Pacific Medical Clinic on several occasions and to Bixby Knolls Hospital for fifteen minutes a day. He would usually be called to the hospital for a particular problem or to look at a contract. He would pick up the locked box containing the money and receipts from the Avalon Clinic and bring it to the Bixby Knolls Hospital at least every other day, and occasionally from the Pacific Clinic. He hired and fired employees and worked out salary arrangements. He negotiated bill disputes with patients. He rode the ambulance as an attendant on two or three occasions and considered himself a jack-of-all trades, doing a ''little of this and a little of that.''

Richard Alfred Gorman was employed as a hospital orderly and unregistered nurse. He had been a corpsman in the navy hospital corps. During that duty he was a surgical scrub nurse and instrument nurse and took care of patients. While there he did suturing on patients. He took a premedical course at a college for two and one-half years. His first job on coming to California was for Rehman at Bixby Knolls Hospital. He worked as an orderly and as a circulating nurse or scrub nurse in the operating room. He was present in the operating room at times when Rehman was the only doctor present other than the anaesthetist. He also stayed alone when no doctor was present on many nights a week at one or the other of the two clinics. He also stayed at the hospital at night once every 10 days. On a few occasions, when no doctors were at the hospital, nurses would call him to see patients. He would see the patients and then call Rehman or whatever doctor was at the clinic.

On one occasion when a three-year-old girl was brought into the hospital with, apparently, convulsions, Gorman came into the room wearing an operating gown and cap with a mask across his face, put his hand on the child's neck, and told the mother and the grandmother, ''. . . 'I am Dr. Gorman. I have seen lots of cases like this. After the child's temperature goes down, she will be all right.' '' He sutured patients. He gave spinal anesthetic. He started intravenous feedings by inserting the hypodermic needle. He telephoned Dr. Rehman's preoperative instructions for medication to be given patients by hypodermic in preparation for anesthesia.

Charles Edwin Symes was hired by Dr. Rehman in 1961 as chief X-ray technician. He had formerly been a licensed chiropractor but was unlicensed as such during the period here in question. He was listed as vice-president of Service X-Ray. He was chief X-ray technician in charge of the two clinics and the hospital. He hired and trained the X-ray personnel. He received 10 percent of the gross charges for X-rays taken at the three places less the moneys paid as wages to the X-ray personnel. He received additional compensation for taking EKG's at the hospital and for the time spent in soliciting chiropractors who were promised "kickbacks" to send patients to the hospital. He inserted hypodermic needles in giving intravenous pyelograms and took many unnecessary X-rays under general instructions from Dr. Rehman.

Because of the voluminous record no attempt is made here to detail what occurred in connection with each patient considered at the trial. Some of the examples testified to are now set forth for illustration as to the effects of the conspiracy on several of those patients.

Mrs. Helen Edwards had been in an automobile collision and injured her shoulder. She went to see Bernard Steuber, a chiropractor, who examined her briefly and then sent her to another doctor for X-rays. The second doctor sent her back to Steuber who then sent her to Bixby Knolls Hospital. She went there to have her neck and shoulder examined. Rehman admitted her into the hospital. A consultant, Dr. Fiske, examined her and recommended a thyroid test and some medication. Many X-rays were taken. During her 16 days' stay in the hospital, Rehman operated on her twice—once was a D & C and cervical biopsy—the other was a uterine suspension, an appendectomy, an adhesionotomy by way of an exploratory laparotomy (mid-line incision from the navel to the pubic area).

Dr. Arthur D. Pedersen, M.D., an expert medical witness testified that neither operation was necessary or indicated. The information from the D & C could have been obtained by a Papanicolaou stain which does not require anaesthesia or surgery. The cervix could have been treated with forceps, cauterized, or scraped with a curette. There was nothing in her history, physical, or complaints, which would substantiate the need for an abdominal operation. The X-ray gall bladder series and the intravenous pyelograph X-ray procedure (kidney test) were unnecessary. Many of the 53 X-rays taken by

Symes were unnecessary. X-rays are considered deleterious to any living organism.

An assistant surgeon was not present during the major exploratory laparotomy, although this was the practice of other doctors practicing in the community. Gorman, however, was present during this operation as "circulating nurse."

Nancy Douglas was a 13-year-old girl who had stomach cramps and was brought to the Pacific Clinic by her mother because her regular doctor's office was not open that day. Rehman asked Nancy what hurt and what the trouble was. She told him her stomach hurt. Rehman pressed on her stomach with his hands and said she had appendicitis. He said that she had to go to the hospital for an appendicitis operation. Mrs. Douglas told him that Nancy had a heart condition and that she wanted him to check her records with the other doctor. She told him that Nancy was born with a tumor by the heart and could not have a strong anaesthetic as it might cause immediate death. Rehman said he would check with the doctor. Rehman asked if they had insurance and was told they did and given the name of the company. Mrs. Douglas said that if Nancy had to be operated on she would like her to be admitted to St. Mary's Hospital and that she wanted their own doctor, Dr. Szabo, to assist in the surgery. Rehman said he did not take his patients to St. Mary's; he took them to Bixby Knolls. He said, " 'I don't know whether Dr. Szabo will be available,' " he would see. Mrs. Douglas took Nancy to the Bixby Knolls Hospital. Upon admittance, she signed operation consent papers in blank. Nothing was said to her about an exploratory laparotomy. She thought it was for appendicitis, Rehman performed an appendectomy and exploratory laparotomy and told Mrs. Douglas that he removed two cysts from Nancy's ovaries.

Dr. Pedersen testified that none of the operations were necessary. The pathology report showed a normal appendix. No ovarian cyst tissue was submitted to the pathologist. Nancy went into shock after the operation and nearly died. She was unnecessarily rehospitalized for treatment to the wound.

Mrs. Janice Sheppard, a 24-year-old mother of four children, had intermittent vaginal bleeding and severe shooting pains in her back and the lower part of her stomach; it was the same as being in labor. She went to the Avalon Village Medical Clinic and was first questioned about insurance coverage. She saw a Dr. Pershing and told him of the bleeding

and pains, and that she thought she was pregnant, as that was possible. Pershing examined her and sent her to Bixby Knolls Hospital for a D & C. He told her he did not feel she was pregnant. While she was in the hospital prior to her operation a catheter that had been inserted into her fell out on the floor when she went to the bathroom. The nurse picked it up and was going to reinsert it. Mrs. Sheppard objected because it had been on the floor, and the girl then rinsed it off in the bathroom and reinserted it into Mrs. Sheppard.

Gorman came in and questioned her about any previous anaesthetics, then told her she would be operated on next. The first time she saw Rehman was in the operating room. After the operation the pain worsened and the bleeding increased. Rehman told her he believed she had a bleeding ulcer and wanted to run some more tests. Symes took the X-rays. After the X-rays, one of the office women in the hospital told her that her insurance would not pay for the balance of the bill over $50 and wanted her to sign a contract with Bank of America. Mrs. Sheppard wanted to wait to talk to her husband. Gorman came in later and told her that Rehman instructed him to tell her that the X-rays showed she definitely had a bleeding ulcer that was inoperable and they felt it best for her to go home and have outpatient care for awhile. She kept asking to talk to the doctor because she wanted to know why, if she was so sick, they were sending her home. She asked what she should do for the pain and was told, ". . . 'Well, you can take a couple of aspirin if it gets real bad.' " Her husband took her home. Two nights later the pain was so bad she could not stand it. She was still bleeding vaginally. Her husband took her back to the Avalon Village Clinic. Rehman came and took an X-ray. He said, ". . . 'Well, that barium that you were given in X-ray has caked just like concrete and it must be gotten out, and I want you to go right over to the hospital immediately.' " Mrs. Sheppard asked if hospitalization was necessary as they did not have the money. Rehman said, ". . . 'Well, you will be entered as an emergency and your insurance will pay.' " She did not go back to the hospital. She went to another doctor who treated her at home for a couple of days and then put her in Long Beach Memorial Hospital where she was operated on for ectopic pregnancy.

Carl Cowan hit his right ankle on a desk in his office on Friday. On Monday, he walked six blocks from his office over

to Bixby Knolls Hospital. His office had hospitalization insurance covering him. After Cowan saw the receptionist, Gorman came up to him, asked him to remove his shoe and stocking, and sent him down to the X-ray room where a woman took X-rays. Shortly after, Gorman came in, looked at the X-rays, and said, ". . . 'It appears that you have a fractured ankle,' " or words to that effect. Gorman then sent Cowan over to Dr. Pershing at the Avalon Clinic. Pershing looked at the X-ray, pointed to what he said was a fracture, and suggested that Cowan go back to Bixby Knolls Hospital and admit himself so that a cast could be placed on his ankle the following morning. He did so, and while he was under anaesthesia, a cast extending from the mid-calf to the end of his toes was put on the leg. He saw no doctor prior to going to the operating room. He then went to the Avalon Clinic for treatment several times a week for about three weeks. During the course of the visits, on several occasions, clinic personnel let him operate their micro-thermal machine and treat himself. Shortly after his release from the hospital, Rehman told him that he had put the cast on. Rehman described how he had pushed a bone chip back into the ankle and then applied the cast. About four days after he had left the hospital the cast became very loose on his ankle. Rehman told him this was normal. Cowan pointed out that he could move his ankle in any direction and that the cast was supposed to have been put on to keep the ankle in place. Before the cast was put on he was told he would have to be in a cast about six weeks. After wearing the cast for about two and a half weeks he decided to check on it and saw Dr. Wiltse, an orthopedic surgeon. The cast was taken off and an X-ray was made. He left Dr. Wiltse's office with no cast. He used a cane for a day and walked normally thereafter.

In the opinion of Dr. Arthur Miller, M.D., no reduction of the fracture was actually performed. There was nothing moved. The bone chip did not move; it was an old fracture. The fibrous tissue in it would be enough so that probably the bone chip could not be moved. In his opinion, the only treatment necessary would have been an elastic bandage and advice to the patient to elevate his foot. This would be an office procedure only.

Sammy Powell, 10 years old, fell on a rock while at the beach on Sunday and cut his leg about mid-thigh. The lifeguard cleaned out the cut and suggested to his mother that she go somewhere to have it treated. Mrs. Powell took Sammy

to the Avalon Medical Clinic where she was first asked about insurance. Then a nurse cleaned the cut and a doctor came in and sewed it up with four stitches. Monday they came back and the nurse looked at the cut and put a cheap dressing on it. On Tuesday Sammy had a temperature of 104 degrees. Mrs. Powell brought him back to the clinic where he was seen by Rehman. Rehman pushed Sammy's stomach, said, ''. . . 'This looks bad,' '' and Rehman shook his head, ''. . . 'This looks bad.' '' He said, ''. . . [I]t looked like appendicitis.'' X-ray pictures were taken of Sammy after about an hour and a half. The X-ray man asked her if she knew they were sending Sammy to the hospital for surgery. She told him they must be kidding. Mrs. Powell went to look for Dr. Rehman. She said, ''I tore that place apart and couldn't find anybody but the receptionist and the . . . technician.'' The receptionist would not let her use the phone to call her husband. She then took Sammy home. Her husband took Sammy to their family doctor that evening. When they returned from this visit that night, her husband gave Sammy a soapy enema. After this, Sammy was all right. He went to bed and was well the next morning.

The record discloses the use of unqualified personnel and lax procedures in the hospital and clinics. Twenty-year-old Bernard Isbell, who had been working for a gas station, was hired by Paul Rehman to be an ambulance attendant. During his ten-month period of employment at the two clinics and the hospital, he also helped with nursing, took X-rays by himself, gave hundreds of intramuscular injections and two I.V. injections while alone with the patients, and sold drugs to patients when no doctors were present. He obtained a first aid card after receiving training from Rehman and some of the other doctors. He did not hold any pharmacy license, nurse's license, license to practice medicine, X-ray registry certificate, or anything of that nature. For approximately three months he worked in the hospital operating room as a circulating nurse. Bernard assisted in setting up the surgery room, put patients on the table, and helped the anaesthetist. On one occasion, when he was working as a circulating nurse during surgery, there was no assistant surgeon on duty, and he saw Gorman holding a hemostat in an open incision on the patient. On every operation at which he was present, he and Gorman would count the sponges after they were put into a pail on the floor. Usually, the operating team would be Rehman, Gorman, the anaesthetist, and Bernard. Once in awhile, he would be

called out of the operating room to drive the ambulance. On two or three occasions, when there was no one else to go with him on the ambulance, Sincoff wore a white smock and rode along as the only attendant. At night, Bernard stayed alone at one or the other of the two clinics all through his 10 months' period of employment. He was alone at the Avalon Clinic at night for approximately five months. Once Sincoff also relieved him and spent the night at Avalon Clinic. Rehman instructed him, if a patient came in, to get the name, address and all pertinent information, find out what the ailment or complaint was. He took the patient's temperature, blood pressure, weight, stopped their bleeding if it was an emergency case. He would put this information on the chart, then he would call Rehman on the phone and relate the information. Rehman wanted to know if this was the patient's first time in and whether the patient had insurance and what it covered. If the patient had no insurance, Rehman would tell him to ask non-emergency patients to come back the following morning; if it was an emergency and there was no insurance, the patient was directed to Harbor General Hospital. If they had insurance, Rehman would come to the clinic and see them.

Symes and Rehman's brother Paul instructed him as to how to take X-rays at the clinic. Symes told him that whenever he took an accident case in for X-rays ". . . to X-ray every injured part that was to be found on the patient." Paul told him that you can make a patient feel that they are hurt in some particular area by suggestion. He said, ". . . 'You can make a patient feel they are hurt in a place where actually they are not.' " He said "you could ask the patient, 'Did you hit your arm?' if they were in an accident: . . . If they said, 'Yes,' then that immediately would verify that you needed an X ray, or if he said, 'Have you had any pains in your legs from the accident?' that nine out of ten times the patient would say, 'Well, I had a little pain,' or 'I had pain,' and then you would take an X ray of whichever leg it was, or both, and just lead it all the way through the body."

Although Bernard had never had any formal classroom education about taking X-rays, never had any course in anatomy or physics, and his only training was generally on the job from Paul, and also doctors, he was the only person taking the X-rays at Avalon Clinic for a period of time. During that period he took hundreds of X-rays by himself with nobody present to instruct him, and on one occasion he took a G. I. series, using straight X-rays, not fluoroscopy.

There was no chart available showing how much radiation he could give a person. There were only three charts in the X-ray room. One would give the measurements on a centimeter scale as to the distance the machine should be away from the person; one showed the kilo and voltage and milliamperes you were to give, and the last chart showed the charges (to be billed) for the X-rays. Once in awhile, if there was an X-ray that he had never taken before, he would refer to a book similar to "Manual of Roentgenological Technique" that he had seen around the clinic.

After Bernard started taking the X-rays himself, he would develop and dry them. Frequently, in the beginning, he had to take X-rays over because "I didn't really know what I was doing." He gave hundreds of injections when no doctor was in the same room with him that included composine or penicillin and benadryl and included intravenous as well as muscular injections.

Bernard had personal possession of the keys to the drug counters. The drugs were located in the front office safe or in a locked cabinet, and the rest of the drugs were in the drug room. Once he gave a patient a shot of demerol and another time sparine when no doctor was present. Rehman gave him permission to give those shots over the phone when Bernard told him the patient was back after two previous visits with Rehman, and was still having the pain. While Bernard was working at the clinics and hospital, his direct bosses were Rehman, Paul Rehman and Symes. After he was discharged from the employ of the clinics and hospital by Sincoff, he went back to work for a service station.

Mrs. Sheila Scalisi, one of the nurses, worked in the hospital a month as a registered nurse although she had not yet obtained her California license. This was with the knowledge of Paul Rehman, the hospital administrator, and of the director of nurses. This nurse complained to both of these persons that the autoclave needed repair, a flash autoclave was needed in the operating room, and more sheets were needed.

Frequently, the name of an assistant surgeon would be shown in the register of operations (the surgery book) although no assistant participated in the surgery. The names were written in before the operation and were not removed if the assistant did not appear.

Just before she was discharged, Mrs. Scalisi complained to the head nurse and to Rehman about lax procedures in the operating room and the fact that consultations should be held

on patients prior to pelvic laparotomies. She told Rehman that she would not bring any more patients into the operating room that did not have consultations for any of these operations that he wanted to perform, like the pelvic laparotomy. Rehman said they would talk about it later. That was the end of the conversation.

For a period of time there was only one autoclave in the hospital. It broke down and was not running properly. The pressure was not registering for correct sterilization. The surgery nurse complained to the director of nurses and the administrator but the autoclave was not repaired for a month or more. The other sterilization equipment was inadequate to handle dirty instruments used in an operation. They did not have enough instruments and since there were only two people in surgery working on sterilization, whose time was consumed by other responsibilities, it was almost impossible to run a group of instruments between cases for the length of time they needed to be run.

As a routine, most of the admitting forms, including consents to operate, were signed by patients in blank and typed in at a later time. Occasionally, the consent for surgery would be signed after preoperative narcotics were administered and the patient was in a state between consciousness and semiconsciousness.

At Avalon Clinic, Rehman's mother removed drug samples from containers left by pharmaceutical salesmen and packaged them in envelopes before sale to the public. She spent a great deal of time in the drug room. She sold drugs to the public when there were no doctors in the drug room or adjacent corridor.

Rehman, his wife, Paul, Duane Williams and Sincoff had discussions about Blue Cross insurance coverage. Williams objected to admitting non-accident patients with Blue Cross coverage because the hospital was not a contracting hospital and the patient would be billed directly for any cost over the $8 or $12 a day which the Blue Cross insurance would pay. Rehman and his wife wanted these patients admitted anyway.

Pacific Clinic and Avalon Clinic were operated 24 hours a day, but there was no doctor continuously present at either one.

James Garneau, a trained and registered X-ray technician, was hired by Paul and told he would have to take EKG's (electrocardiogram for study of the heart) as well. This man had no prior experience in that field and knew very little

about it. He told this to Paul. After he was hired, Paul showed him once how to take an EKG. Thereafter, he took EKG's pursuant to orders. Several days after he went to work at the hospital, he was sent over to Pacific Clinic. Rehman and Paul talked to him. He was asked to help out at night taking X-rays and giving any medications that were ordered after Rehman saw the patients. When Garneau asked if there would be any salary increase he was told they could either give him time off or they could work on a percentage basis. He was told that when a patient came into the clinic he was to take a temperature, respiration, pulse, and take a short history from the patient as to what was their chief complaint and call the doctor on duty who would tell him what medication or injections to give. The medication might be penicillin, aspirins, whatever it may be.

Herman Eversley, a registered X-ray technician was given an order written by Rehman and told to draw blood for premarital purposes on two people. He did it over objection and later complained to Rehman. Rehman told him that he should cooperate and be a member of the family and help out wherever he could. Gorman told Eversley that he worked in surgery, in assistance to Rehman, and that on occasion he would suture patients.

### The Overt Acts

Overt Act No. 1 (splitting fees for patients referred to the hospital by chiropractors). Symes, Rehman and Sincoff actively solicited business from chiropractors by offering fee-splits, gratuities and kickbacks, and offering professional considerations not available to chiropractors in any other hospital. Symes was sent out to induce chiropractors to send their patients to Bixby Knolls Hospital. He received additional compensation for his expenses in connection with this solicitation work.

Symes contacted Dr. John J. Sanford, a chiropractor whom he had known before. He told Dr. Sanford that he was a professional or public relations man representing Bixby Knolls Hospital. He asked if Dr. Sanford would like a hospital to send his patients to that needed hospitalization, where he could visit his patients, see the case histories, and discuss the case with the doctors in charge of the hospital or with specialists that might be called in. Symes asked if Dr. Sanford would like to have his patients sent back to him for post-medical or postoperative care. Dr. Sanford told Symes he would like such a set-up; that it would be very nice.

Symes then told him, ". . . 'You also will be considered—to have all considerations of the hospital as a doctor in the hospital.' " Symes then said there would be kickbacks or gratuities without going into detail at that time about what they might be in individual cases. A dinner meeting was then discussed where Dr. Sanford would meet the doctors and all the staff of the hospital.

Two days later, Symes, Paul Rehman, the hospital administrator, and another chiropractor named Sawyer met Dr. Sanford at his office. They wanted to talk about the procedure of the hospital and about a particular patient, Mary Arnett, that Dr. Sanford had sent to the hospital the preceding day.

During the conversation, Paul told Dr. Sanford, in response to a question about what gratuities would be given to the referring doctors, that on medical cases the doctors would receive a third; on surgical cases and on obstretric cases, the doctor would receive 50 percent.

With respect to Mary Arnett, Dr. Sanford told Symes he was not pleased about what had happened to her in the hospital; that Symes had no business trying to hold that patient against her will. Mrs. Arnett, who was 63 years old, said she had been examined and released by one of the doctors at the hospital. That when she wanted to leave, they caught her in the hall and made her come back. Dr. Sanford told them that it was not right to hold a patient against his will if they wanted to come home; that he understood it was not lawful to hold a patient physically or any other way against his will in a hospital. Mrs. Arnett had said that Symes had grabbed her by the arm and told her she could not leave, that the doctor had said she had to go to bed. Symes said he was sorry about the whole matter, that he did not realize how serious it was. Paul said Symes had no business doing that, that it would never happen again. Each of them apologized to Dr. Sanford and said maybe now they could get together and have his patients brought to the hospital under a better feeling.

They then discussed going to lunch so Dr. Sanford could meet Rehman and Sincoff. They met and all the persons were present. Rehman discussed the procedure of the hospital and the good will toward referring doctors. He said that the doctors referring the patients would have the same consideration as any other doctor that was in the hospital at the time, whether he was a chiropractor, osteopath or medical doctor, they would all be treated equally. However, to the point of chiropractors, they could not treat in the hospital, but Dr.

Sanford would be able to see his patient, read the case history and discuss certain things regarding the case with Rehman or any other doctor that happened to be on the case. When the meeting adjourned, Dr. Sanford went over to the hospital and was shown through by Symes. After this, Dr. Sanford sent patients to the hospital.

About two weeks later, Dr. Sanford got a call from Mary Arnett at 2 a.m. He told her to meet him at the hospital. He then called Rehman and told him he was sending a patient who was hemorrhaging to the hospital. Rehman asked Dr. Sanford how severe; he said he did not know how severe it was, but the patient was hemorrhaging. Rehman said he would be right down.

Dr. Sanford arrived at the hospital before Mrs. Arnett. She came in approximately 10 minutes later. There was no doctor in attendance at the hospital. After waiting about half an hour, Dr. Sanford had the nurse call Rehman. This was about 45 minutes after the first call. He talked to Rehman on the phone, told him the patient was at the hospital, and asked him what should be done. Rehman said, ". . . 'Do what you can do.'" Dr. Sanford was not permitted to do anything, so Rehman told him to put the nurse back on the phone, he would give her orders. After the nurse talked to Rehman, Mrs. Arnett was put to bed in the hospital and given glucose intravenously. Dr. Sanford stayed around for approximately another hour and a half. During that time, neither Rehman nor any other doctor showed up.

Dr. Sanford had a conversation one time with Rehman about when he was going to get his referral fee money.

Symes also called on Dr. Charles R. Hastings, a chiropractor practicing in Long Beach, who was president of the Long Beach District of the State Chiropractic Association. He told Dr. Hastings that a doctor of osteopathy had assumed the ownership and management of the Bixby Knolls Hospital and invited his participation and the participation of the members of his profession insofar as referring cases to this doctor (Rehman) and this hospital (Bixby Knolls) when they came upon cases that were beyond the scope of their practice. Symes assured him that it was a general hospital, licensed as such, for major surgery and obstetrical care.

Symes asked that he carry the message to the rest of the members of the association as they would like to have referrals from the chiropractors. Dr. Hastings told Symes that before he could do such a thing they should have an inspec-

tion of the hospital to see the facilities. He told Symes that he felt they should have a meeting with the doctor that was in charge so they could outline proper procedures; so they would know under what circumstances and just how the patients would be admitted, and under whose name and who would have the care of them.

Symes told him that such a thing could be arranged and that he would get in touch with Dr. Hastings to advise him further. Symes stated that there would be an arrangement made whereby there would be a reimbursement to those doctors of chiropractic who referred cases to Bixby Knolls Hospital. No specific meeting date was set up at that time and it was left that Symes would arrange such a meeting and notify him.

A couple of weeks later Symes called Dr. Hastings on the phone and notified him of a luncheon meeting. When Dr. Hastings got to the restaurant, Symes was the only one who had arrived. Symes reviewed the arrangement that he had discussed previously. He wanted Dr. Hastings and the others that were coming to the meeting to have an opportunity to meet Rehman and get firsthand from him what he had to offer. Rehman arrived later with Sincoff, who was introduced as the attorney for the hospital. Other chiropractors from the Long Beach district of the association and other districts were present. It was an informal meeting, a general discussion around the table. Symes was the one who introduced Rehman, Sincoff, and the rest of the chiropractors as they came in.

Rehman informed them that he had purchased and was operating the Bixby Knolls Hospital and that he would appreciate any referrals that they could send him and to the hospital. He informed them that he had staffed the hospital with certified specialists in the various departments and they were perfectly able to cope with any case that the chiropractors might refer there which the chiropractors felt was beyond the scope of their practice and needed either medicine or surgery; that he did not profess to be a specialist in all departments but that he had consultants available; however, he wanted to assure them that he would be the admitting doctor in the case and would keep control of the patient; that if and when the patient was discharged and needed further treatment, then that patient would still remain in the chiropractor's care and would be referred back to the chiropractor.

Dr. Hastings said that before he would feel at liberty to refer any cases at all, he would want to inspect the hospital.

He thought the chiropractors should have a meeting with Rehman in the hospital and lay down definite rules and procedures that should be followed; he felt that if this did not happen somebody would get in trouble and he did not want to be the instigator of such a thing in his profession. The subject of taking X-rays for the chiropractors was also discussed. Dr. Hastings left the meeting fully expecting a later meeting at the hospital.

Symes visited Dr. Hastings at his office about a month later. During that interval Dr. Hastings had not inspected the hospital and had not referred any patients there. Symes wanted to know why Dr. Hastings had not referred any cases over to Bixby Knolls and said that he was missing out on a lot of money by not doing so. Dr. Hastings restated his position: that he was not interested in any money being given back to him for any cases that he referred anywhere, and that he was not under any circumstances going to refer any patients to any hospital until he had the opportunity to see more about it; until rules and regulations were laid down such as he had outlined previously. Symes then referred to specific chiropractors who were referring patients and getting money for doing so, but the amounts were not mentioned.

Overt Act No. 2 (subjecting patients to excessive X-ray exposure). Evidence was offered showing that poor technique was utilized in the X-ray department by Symes and his assistants; barium in connection with X-rays was left in a patient by Symes; many X-rays had to be retaken because the help did not really know what they were doing. The dye used for pyelograms was injected intravenously into patients by Symes and other personnel unlicensed to perform such activity.

Numerous unnecessary X-rays were taken. Symes' instructions from Rehman were to X-ray all injured parts. Suggestions were made to patients so that they thought they felt pain, thus justifying the taking of additional X-rays. Rehman ordered that all children with respiratory ailments be routinely X-rayed every three days. Other children received excessive X-rays also.

Symes got 10 percent of the gross fees charged on all X-rays. Eversley, one of the X-ray technicians working under him on a flat salary, was told by Paul Rehman and Symes that he could make a lot more money on a percentage basis. Eversley was told by Paul to take far more X-rays than were required by usual standards. With approval of Rehman double sets of X-rays were taken of some patients, first at the

clinic, then at the hospital. Mr. Garneau, one of the hired X-ray personnel, quit when Rehman told him to take a double set of X-rays and to X-ray all injured parts of a woman who had just been X-rayed from head to toe at the clinic.

When Williams, general manager of the hospital, told Symes he was taking too many X-rays, Symes said he was following Rehman's orders.

Overt Act No. 3 (Gorman administered anaesthesia to patients during surgery at the Bixby Knolls Community Hospital).

Overt Act No. 4 (Gorman sutured patients after surgery at said hospital).

Overt Act No. 5 (Gorman gave hypodermic injections to patients in said hospital).

During a vein-stripping operation, Gorman administered anaesthesia to the patient while Dr. Green, the anaesthesiologist, who had scrubbed in on the operation, assisted Rehman by telling him where to make incisions and how to use the long wire used to retract the veins.

Gorman administered intravenous solutions to patients both before and after operations by inserting the needle into a vein in the patients' arms. He did this in the operating room and in patients' rooms. He said that he had been told that it was all right to write preoperative orders for medication to be given to patients prior to surgery. He gave Mrs. Helen Mae Mercer some shots in the back in the operating room just prior to surgery. He was the only one in the room at the time except one nurse.

Gorman related phone orders, assertedly from Rehman, to the nurses concerning preoperative medication for patients scheduled for surgery. On two occasions, Gorman asked the nurse to prepare the hypodermic for him (Gorman) and leave it on the preparation table. She prepared demerol and atropine and marked it with the patient's name. Gorman said, ". . . 'I will give them in surgery—I will give it in surgery.'"

Nurses knew operations would be scheduled when they read preoperative medication orders Gorman had written up the night before.

Gorman used a hemostat to clamp off bleeder veins during an operation. He sutured skin together after operations.

Gorman told Randy Eversley, an X-ray technician, that he worked in surgery in assistance to Rehman and that on occasion he would suture the patient. He told Dr. Lee that Reh-

man permitted him to sew up abdomens in the operating room.

Williams, the hospital manager, saw Gorman suturing a patient undergoing surgery during one of Rehman's operations. Williams made some comment as a joke to Rehman about his surgical assistant. Rehman made no response; he was talking on the phone to someone and he just looked up at Williams and smiled. On many occasions when Rehman operated, he let Gorman suture up the incision in the skin. Rehman would instruct Gorman, telling him, ". . . 'That's right.' " or " 'not so far apart,' " or maybe, " 'a little closer,' " or something to that effect.

Rehman also permitted nurse Scalisi to suture patients when no assistant surgeon was present.

Overt Act No. 6 (permitting Bernard Steuber, a chiropractor, to deliver the child of Myna M. Schofield at the Bixby Knolls Community Hospital).

Overt Act No. 7 (permitting Alfred F. Libby, a chiropractor, to deliver the child of Mary Susan Lockwood at the Bixby Knolls Community Hospital).

Overt Act No. 8 (permitting M. C. Shaffer, a chiropractor, to deliver a child at the Bixby Knolls Community Hospital).

Overt Act No. 9 (deleted by the court).

Overt Act No. 10 (causing to be filed fictitious birth certificates for child of Myna M. Schofield).

Overt Act No. 11 (causing to be filed a fictitious birth certificate for the child of Mary Susan Lockwood).

Dr. Steuber, a chiropractor, delivered the Schofield baby at Bixby Knolls Hospital. He had a practical nurse administer ether to the mother.

At 11 p.m., the night report showed an obstetric patient would be in. A Mrs. Schofield came into the hospital in active labor about 12:15 a.m. She was put into the labor room. Shortly thereafter. Dr. Steuber arrived and greeted Mrs. Schofield, his patient. Delivery was at 2:22 a.m. After delivery, Steuber called Rehman on the phone. He said: " 'Dr. Rehman, this is Dr. Steuber. I have finished the delivery so you won't need to come in,' " and then there was a pause. and he said, " 'There were no lacerations,' " and then, " 'Thank you,' " and " 'Good night.' "

Rehman had not come into the hospital at all by the time the charge nurse went off duty at 7:30 a.m. The nurse found that Steuber was a chiropractor at 7 a.m.

Rehman signed the Schofield birth certificate statement:

" 'I hereby certify that I attended this birth and that the child was born alive at the hour, date and place stated above.' '' The nurse's notes for the Schofield baby delivery originally showed Dr. Steuber's name. The notes appeared to have been erased and Rehman's name was superimposed in heavier ink that the original writing.

The charge nurse, Mrs. Spika, later received instructions that henceforward all nurse's notes, admission records, X-rays, lab slips, and narcotic records were to have Rehman's name on them, with the exception of a visit by a medical, pediatric, or surgical consultant and then to use that man's name. This changed previous instructions relating to putting down the name of the doctor actually present.

Mrs. Dowling, the unlicensed obstetrical nurse who had written Steuber's name in, was later instructed by Mrs. Boyle, director of nurses, and Rehman to change a number of delivery and labor records because these doctors only had courtesy privileges and were not on the active staff and their names should not appear on the records. Names mentioned were Steuber, Libby, Shaffer and Petchek. Nurse Boyle then gave Mrs. Dowling four to seven records and told her to completely copy them and put Rehman's name on all the new copies. She later found out that all these were names of chiropractors.

Rehman authorized Libby to attend delivery of the Sebring baby while Rehman was in surgery. Libby delivered the Lockwood baby in the absence of Rehman or any doctor. He had nurse Dowling administer ether to the mother and cut the umbilical cord.

On another delivery Rehman and Steuber were in attendance. Steuber delivered the child and cut the umbilical cord. Rehman was assisting and gave the anaesthetic and helped with the uterine pressure.

Nurse Dowling was present when Dr. Shaffer was the only male person present in the delivery room and a baby was born. She administered the anaesthetic.

Overt Act No. 12 (Rehman attempted to perform surgery upon Mrs. Bobbie Doda at the said hospital for the purposes of making a claim upon an insurance company and Kenneth Eugene Doda when no such surgery was necessary).

Mrs. Doda had pains in her stomach and through her back. She was seen at home by the chiropractor, Dr. Sanford, who sent her to Bixby Knolls Community Hospital. She was given intravenous injections and some tests, and Rehman examined

her. She was given a preoperative medication shot and prepared for appendicitis surgery, but not told what operation was to be performed. She was given a surgical hat to put on. She felt groggy and went to sleep. Her husband was asked to pay $200 before the operation could be performed. He did not have the money and was asked if he could pay monthly and put up furniture collateral to satisfy the fact that the hospital would get paid.

After the preoperative medication was administered, Rehman and Gorman came into the room and talked to the nurse. Rehman said, ''Her insurance was no good. She'd have to be shipped to the County.''

When Mrs. Doda awoke she was groggy and hungry. A nurse came in, threw her clothes on the bed, and said, ''You're dismissed.'' She got dressed, and her husband took her to Harbor General Hospital. On the way there she was sick and her head was swimming. She felt ''real crazy.'' No surgery was performed on her there. She did not recall getting any shots at Harbor General. She felt groggy during her two day stay there. She was so depressed and groggy that she asked the doctor there to dismiss her. She eluded the policeman, left with only her hospital gown on, and thumbed her way home.

In the opinion of Dr George E. Bryant, Mrs. Doda did not need any surgery. After examining the Bixby Knolls Hospital chart plus the Harbor chart, he could not find adequate evidence of appendicitis to warrant surgery. She did not have a case of acute appendicitis.

Overt Act No. 13 (Sincoff and Rehman urged James Vest to have his wife remain in Bixby Knolls Community Hospital for surgery when no such surgery was necessary).

Overt Act No. 14 (Rehman attempted to perform surgery upon Peggy Ann Vest, at the said hospital, for the purpose of making a claim upon an insurance company, when no such surgery was necessary).

Overt Act No. 16 (Rehman submitted claims and fraudulently and feloniously took money from the United States federal government, the Dependents Medical Care Program, Hospital Service of Southern California and California Physicians Service).

Mrs. Peggy Ann Vest first saw a Dr. Pershing at Avalon Clinic who gave her some weight-reducing pills and suggested she go for an eye check. Several weeks later she talked to Rehman about not wanting to have sexual relations with her

husband two weeks before her monthly menstrual periods. Rehman examined her vaginally and said she had a ''mess of cysts'' and should be hospitalized immediately as an emergency case. She wanted to go to Memorial Hospital but Rehman said he only used Bixby Knolls Hospital. Mrs. Vest was the wife of a sailor and could be treated without military authorization under Medicare as a serviceman's dependent if it were an emergency case. Her husband filled out the Blue Cross forms for Medicare and she entered the hospital. A D & C was performed after which Rehman told her she had a tumor or tumors on her uterus; if only one tumor was present, he would only have to remove part of the uterus; if more than one, or malignant, they might have to remove all of it. Gorman obtained Mrs. Vest's consent to operate on both occasions. Dr. Robert N. Lee, M.D., did a consulting vaginal examination on Mrs. Vest. He told Mr. and Mrs. Vest she did not need the surgery, then scheduled by Rehman for the next morning, and to get her out of the hospital that night.

Vest talked to Rehman telling him what Dr. Lee had said. Rehman asked Vest if he had noticed anything peculiar about Dr. Lee's eyes, whether they were dilated. Rehman then suggested that they go to a restaurant to meet Sincoff. When Sincoff arrived about midnight, Rehman asked Vest to tell Sincoff what happened with Dr. Lee. He did so. They went over the matter of Lee's eyes. Sincoff asked Vest questions. Vest thought Sincoff was one of the leading doctors at the hospital. Sincoff told Vest that if Dr. Rehman said she needed an operation, undoubtedly, she needed it. Sincoff listened to Rehman and nodded agreement.

Rehman and Sincoff wanted Vest to listen to some tapes that Dr. Lee had made when he examined Mrs. Vest. Vest and Sincoff then returned to the hospital and looked for the tapes for approximately 45 minutes to an hour. Sincoff could not find them. While they were looking for the tapes, Sincoff said he could not understand why Dr. Lee would make a statement like that. At 1 o'clock in the morning Sincoff and Vest went into his wife's room. Mrs. Vest looked like she had been crying. She said that she had a headache and had been feeling bad and had not taken any of her pills. She said the nurse had brought her one, but she would not take it. The pill was still on her nightstand. Sincoff told her to go ahead and take it, it was a sleeping tablet, it would make her sleep. She took the pill.

Vest then left the hospital and went home. Dr. Lee was

waiting for him. They had a conversation. It was approximately 1:30 a.m. Vest then went back to the hospital. He told the nurse he wanted to take his wife out. The nurse said she would have to check with Rehman and called him on the phone. Vest talked to Rehman and told him he wanted to take his wife out of the hospital. Rehman said to wait until morning. Vest said no. Rehman asked to talk to the nurse and they had a conversation. The nurse then called Sincoff who asked Vest why. Vest said he was just taking her. Sincoff said something about waiting until morning and then said okay.

After removing his wife from the hospital, Vest took her to see Dr. David A. Gean, M.D., the next day. Dr. Gean make a complete physical examination, including a pelvic examination of Mrs. Vest. He noticed that there had been a recent surgical procedure on the cervix. The uterus was normal size. It was in a normal position. He could find no tumors or cysts on the examination.

After the examination, he was of the opinion that her main problem was emotional. He prescribed nothing. He wanted to get the hospital records where she had been previously so he could see to what extent she had been investigated and to see what the procedure had been that had been performed. He later talked to Rehman. Dr. Gean did not feel that surgery was indicated in any way to correct any of the problems Mrs. Vest had. Even the D & C might have been a little premature. The simple way to investigate spotting after a menstrual period is by taking a cancer smear. He did not know of any of his confreres who would hospitalize this patient and do a D & C on her.

The chronic cervicitis indicated by the pathology report on Mrs. Vest means a chronic inflammation of the cervix and may be a normal finding in a normal uterus. Usually, in most cases, patients are unaware that they have it. If it is severe enough to require treatment, ordinarily, it is treated by electrocauterization.

On Rehman's physical findings he had indicated that there was a fourth-degree retroverted prolapsed uterus. Dr. Gean found no retroversion of Mrs. Vest's uterus when he examined her the day after she was discharged from the hospital. There was a mild degree of prolapse which was normal in a woman who had given birth to four children.

When asked about removal of the uterus, Dr. Gean said that you would not just proceed to a major surgical procedure, especially in a girl only 26 years old. You might put

her on corrective exercises. You might try to suppress ovulation through medication.

Twenty-five percent of all girls have retroverted uteruses. They rarely, uncommonly, cause much of a problem. Usually, the uterus can be replaced manually and a small pessary inserted. This hysterectomy Rehman had Mrs. Vest scheduled for was not indicated.

Medicare was billed through Blue Cross and Hospital Service of Southern California for $519.10 and through California Physicians Service (Blue Shield) for $100 for the hospitalization and D & C performed by Rehman.

Overt Act No. 15 (Sincoff asked Dr. Robert N. Lee to change consultation report on Sadie Johnson, who was a patient at the Bixby Community Hospital).

Dr. Lee was originally interviewed for internal medicine consultation work at Bixby Knolls Hospital by Rehman and Sincoff. The initial arrangement agreed to by Rehman and Sincoff was that Dr. Lee would collect $50 for each consultation he was asked to do. He was supposed to come into the hospital every day and there would be a list of names of patients for him to see. Dr. Lee started to work in October 1961. During the latter part of November 1961, he had another conversation about financial arrangements with Rehman and Sincoff. It was then agreed that he would be paid a thousand dollars a month.

After Dr. Lee would get the patient's history and make his examination and determine all the things he felt were significant medically and formulate his recommendations, he would dictate his consultation report. Among the consultation reports Dr. Lee wrote were those of two patients, Sadie Johnson and Goldie Langley.

The Sadie Johnson report contained the following wording: " 'Reasons and recommendations. It has been noted that the patient has received a hemorrhoidectomy for internal and external hemorrhoids, since this hospitalization. It is noted that the patient has had multiple X rays taken at this hospital since 10-18-61; it was noted that the patient had also received a sigmoidoscopic examination, which I believe was in order, along with the subsequent hemorrhoidectomy. The most striking thing in this case, I believe, is that this patient has been subjected to multiple X rays since 10-18-61 which includes a chest X ray, P-A and lateral, skull X rays with G.I. series on 10-19-61, barium enema 10-20-61, repeat chest X ray on 11-6-61, and a repeat skull X ray on 11-10-61. It is my

clinical belief, and it has been proven by men in the radiological field, that patients should not be subjected to X-ray procedures unless absolutely necessary. It has been noted that the patient's first skull X ray series taken on 10-19-61 was reported as being within normal limits, and I cannot think of any clinical reason, without any clinical evidence of trauma to the head which the patient did not give, for repeat skull X ray on 11-10-61. I think this is not clinically in order and such medical procedures should not be performed. The patient has informed me upon interrogation that since 8-19-61 she has had repeated skull X rays taken at the Avalon Medical Clinic and all have been normal. It is also interesting to state at this time, that patients with diseases compatible with Paget's disease, multiple myeloma, acromegaly, or any other disease involving the bone, including the skull and the rest of the bones of the body, that repeated X rays are not done this frequent. I would certainly recommend this patient be discharged immediately after there is no symptoms of rectal bleeding subsequent to her hemorrhoidectomy.' ''

The Goldie Langley report contained the following recommendations and reasons: '' 'It is interesting to note that this patient upon previous examination, as far as could be ascertained from her history, was subjected to a cystoscopic examination and also an I.V. pyelogram.' ''

'' 'Another interesting finding is that this patient gave symptoms prior to the present hospitalization of influenza which, upon receiving medications the symptoms subsided. The ureter spasm that could be possible etiology of her pain in the right inguinal area . . . could be subsequent to the previous cystoscopic examination. Due to the clinical reasoning that the patient was subjected to the above-mentioned diagnostic studies on the previous admission, it was interesting to note that upon this admission no urinary diagnostic studies were performed before subjecting the patient again to an I.V. pyelogram and retrograde pyelogram and cystoscopic examination. . . .

'' 'It is my clinical belief that this patient was subjected to these surgical diagnostic procedures without obtaining the proper diagnostic studies before they should have been performed. It is noted on the patient's chart that a c.b.c.— . . . blood count on admission—revealed a white blood cell count of 6,700, which is normal, . . . which is certainly within normal limits; as well as a urinalysis that showed a specific gravity of 1.010 with occasional white blood cell per high

power field, and 1 to 5 epithelial cells and no evidence of albuminuria [excessive amount of protein in the urine].

" 'It is also interesting to note that this patient's temperature, upon admission, was 98 degrees and there was no clinical complaints of chills, fever, dysuria [pain upon urination] . . . or hematuria [blood in urine]. The patient revealed that she had never noted hematuria, polyuria [excessive urination], . . . or dysuria . . . or no history of nocturia [awaking at night to urinate]. . . . It is also interesting to note that this patient never complained of CVA [back kidney area] tenderness. . . .

" 'Within a period of one month, the patient has been subjected to two I. V. pyelograms, two cystoscopic exams, which I do think are not in clinical order. It is also interesting to note that with the patient's suspect history of having some kidney disease or some disease referable to the renal system, that a B.U.N. [a blood, urea, nitrogen study in which the blood sample is removed just like you draw blood for a blood count, with no injection in the vein or subjection to anaesthesia] or a creatinine study [done by similar blood sample] were not obtained. . . .

" 'These diagnostic studies, namely, B.U.N., creatinine studies, urine culture and sensitivity, in my way of thinking, should always be obtained before going to such drastic procedures to establish a diagnosis. I certainly recommend that this patient be discharged from the hospital immediately.' "

The morning after the Johnson consultation, Dr. Lee was quite disturbed about the X-rays and talked to Symes and Rehman. After the two consultation reports were typed, Sincoff saw Dr. Lee in the hallway of the hospital. Sincoff had the first two copies of each report in his hand. Sincoff asked Dr. Lee, " 'What about these?' " Dr. Lee told him that he had done the consultations and there they were. Sincoff said, " 'Well, I think you should change your reasons and recommendations, or change, reword them, because they are pretty —the wording is pretty strong and it may cause later complications.' " Dr. Lee did not say anything in reply, he just walked away. He thought this conversation with Sincoff took place before he talked to the police.

Overt Act No. 17 (Rehman detained Agnes Craighead as a patient at the Bixby Knolls Hospital for a period of three days for the purpose of making a financial claim upon her and

Hospital Service of Southern California when such detainment was not necessary).

Mrs. Craighead had a bursitis attack in her arm. She had an appointment with another doctor, but because of the severe pain on Saturday went to the Bixby Hospital for an emergency shot to carry her over until her appointment some three hours later. Rehman knew this, gave her a shot in the hip which made her unconscious, and kept her in his hospital. Her husband wanted to get her out but could not; she wanted to leave but could not. Her husband was told by Rehman that she wanted to stay; she was told her husband knew all about it. Each time she awoke she was given another shot in the hip and she went to sleep again. Finally, on Monday, they released her, only after she signed herself out against the hospital's advice. She still had the severe pain.

On Tuesday morning Mrs. Craighead went to the doctor's office where she had her original appointment, was given a shot in the shoulder where the pain was, and the pain cleared up an hour later. Two days after taking the medication this doctor prescribed she was much improved.

Subsequently, the Craigheads sued Bixby Knolls Hospital in small claims court and got a judgment for the moneys paid. Sincoff appeared in court at that time.

As heretofore indicated the amended indictment, in one count, accused appellants of conspiracy in violation of section 182 of the Penal Code, a felony, to commit acts injurious to the public health and to commit the various other crimes specifically designated. The accusations were further clarified by some 16 alleged overt acts. These acts and the violation of the specific code sections and administrative provisions enacted under the hospital licensing act are charged to constitute the one crime of criminal conspiracy of which defendants were found guilty.

As a first ground of claimed prejudicial error requiring a reversal of the judgment against them, defendants contend that that portion of Penal Code section 182, subdivision 5, "To commit any act injurious to the public health, . . ." is void in that it is so vague as to fail to constitutionally clearly define a standard of guilt.

Defendants make no reference to subdivision 1 of section 182 providing that if two or more persons conspire "To commit any crime . . . they are punishable." They evidently do not seriously challenge the sufficiency of the evidence herein to fully establish their commission of the crime of

conspiracy to violate Penal Code section 240 (assault), 242 (battery), and 484 (theft); Business and Professions Code sections 650 (referral "kickbacks"), and 2121 (practicing any mode of treating the sick without a certificate); Insurance Code section 556 (making false claim under insurance contract), or Health and Safety Code section 10675 (furnishing incorrect or false information on birth certificates).

It is true that the meaning and constitutionality of the specific words "any act injurious to the public health" have not as yet, standing alone, been passed upon by the courts of this state.

*Musser* v. *Utah* (1948) 333 U.S. 95, 97 [92 L.Ed. 562, 565, 68 S.Ct. 397], directs us, when determining a constitutional claim of statutory vagueness attacking the meaning of words such as "any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws," to look to the whole body of the common and statutory law of our state and then judge the phraseology in that context.

The common law is all the statutory and case law background of England and the American colonies before the American Revolution. (See *Martin* v. *Superior Court*, 176 Cal. 289, 292-293 [168 P. 135, L.R.A. 1918B 313]; Civ. Code, § 22.2; Black's Law Dictionary (4th ed.) pp. 345, 346.)

Our California courts have, however, had occasion to consider and uphold the constitutionality of subdivision 5 of section 182 of the Penal Code, particularly as to the remaining words: "to public morals, or to pervert or obstruct justice, or the due administration of the laws." As said by our Supreme Court in *Calhoun* v. *Superior Court* (46 Cal.2d 18, 31 [291 P.2d 474]), "There is no merit in the contention that subdivision 5 of section 182 of the Penal Code is unconstitutional. The constitutionality of this statute was expressly upheld in *Lorenson* v. *Superior Court*, 35 Cal.2d 49, 59-61 [216 P.2d 859], and *People* v. *Sullivan*, 113 Cal.App.2d 510, 519 [248 P.2d 520]. And, contrary to Calhoun's contention, full consideration was given to the decision in *Musser* v. *Utah*, 333 U.S. 95 [92 L.Ed. 562, 68 S.Ct. 397]. (See *People* v. *Sullivan*, at pp. 522-523.)"

In both *Lorenson* (p. 59) and *Sullivan* (pp. 519, 520) it was recognized that acts committed ". . . to pervert or obstruct justice, or the due administration of the laws" were recognized as criminal offenses at common law. The same is

true as to the words "to commit any act injurious to the public health."

Analysis of Penal Code section 182 reveals a clearly defined common law meaning of the words "act injurious to the public health" which is directly applicable to the facts of the instant case.

What is now Penal Code section 182, in almost its exact wording, was first enacted by the California Legislature, First Session, sitting in San Jose in April 1850.[2] This enactment necessarily had a common law background and was passed the year before Field began his code work in California. (See Senate Judiciary Committee, Report on Civil and Common Law, 1 Cal. 588 [Appendix—February 27, 1850].)

The 1850 California enactment of chapter 99, section 102, in its exact wording and spelling, except for numbers preceding the individual clauses and for the quantum of penalty enacted, can be traced to a New York enactment of at least 1829. (2 N.Y. Rev. Stats., part IV, chapter 1, title VI, § 8, pp. 691-692 (1829).)

Going further back into antiquity, we find that public health was concerned basically with two concepts: (1) the skill and practice of doctors, and (2) quarantine for the curtailment of the spread of disease.

Upon the surrender of New Amsterdam by the Dutch to the English in 1664, the Duke of York set up laws for the new colony of New York.

The Duke of York's laws for the government of the colony of New York were compiled under the direction of Colonel Richard Nicolls, the first English governor, from existing statutes for the government of the other English colonies in America. They were first promulgated at Hempstead, on Long Island, March 1, 1664 or 1665 (depending on which calendar

[2]"If two or more persons shall conspire either to commit any offence; or falsely and maliciously to indict another for any offence; or to procure another to be charged or arrested for any such offence; or falsely to move or maintain any suit; or to cheat or defraud any person of any property by any means which, if executed, would amount to a cheat; or to obtain money or property by false pretences; or to cheat or defraud any person of any property by any means which are in themselves criminal; or *to commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice or due administration of the laws,* they shall, on conviction, be punished by imprisonment in the County Jail not more than one year, or by a fine not exceeding one thousand dollars." (Stats. 1850, Ch. 99, AN ACT concerning Crimes and Punishment [passed April 16, 1850], Ninth Division, Crimes and Offences Against Public Justice, § 102, p. 242; italics added.)

is used) and are probably the earliest written laws of New York.

Several original copies of the Duke's laws exist, among which are the East Hampton and Roslyn copies. The following, interspersed somewhat alphabetically amidst titles such as "church wardens," "charges publicke," "children and servants," and material relating to courts, is taken from the East Hampton copy (p. 27): "CHIRURGIONS,[3] MIDWIVES, PHYSICIANS.

"That no Person or Persons whatsoever, Employed about the Bed of Men women or Children at any time for preservation of Life or health as Chirurgions, Midwives, Physicians or others; presume to Exercise or put forth any Acte Contrary to the known approved Rules of Art in each mistery or Occupation, or exercise any force, violence or Cruelty upon, or to the Bodies of any whether Young or old; without the advice and Counsell ['consent' instead of 'councell' in Roslyn copy] of the such as are Skillfull in the same Art (If such may be had,) or at least of some of the wisest and gravest then present and Consent of the patient or patients if they be Mentis Compotes: much less Contrary to such Advice and Consent upon such severe punishments as the nature of the fault ['fact' instead of 'fault' in Roslyn copy] may deserve, which Law nevertheless is not intended to discourage any from all Lawfull use of their skill but rather to encourage and direct them in the right use thereof, and to inhibit and restrain the presumptious arogancy of such as through Confidence of their own skill, or any sinister[4] Respect, dare bouldly attempt to Exercise any violence upon or toward the body of young or old one or other, to the prejudice or hazard of the Life or Limb of man, woman or child." (Vol. 1, The Colonial Laws of New York from the Year 1664 to the Revolution, pp. 6, 27.)

Further applicable American colonial law is found in "An Abridgment of the Laws in Force and Use in Her Majesty's Plantations; (Viz.) of Virginia, Jamaica, Barbadoes, Maryland, New-England, New-York, Carolina, &c." (Printed in 1704.) Herein, under the section on the laws of New England, at page 23: "An Abridgment of the Laws and Ordinances of New-England. Chyrurgeons and Midwives: No Surgeon Mid-

---

[3] Chirurgeon is an archaic word for surgeon. (Webster's Third New International Dictionary (1961), p. 392.)

[4] "Sinister . . . 3. archaic: dishonestly underhanded; Fraudulent . . . ." (Webster's Seventh Collegiate Dictionary, p. 812; Webster's Third New International Dictionary, p. 2125.)

wife or Physitian, may upon the Body of any person perform any Operation, Cure or Practice of Art, tho never so agreeable to the Rules of Practice, without the consent of the Patient, if they be Mentis Compotes, and of their nearest Relations, if they be not. Nor upon the Body of any Child, without the consent of the Parents or Guardian of the said Child.'' In the same volume, under the laws of Virginia, at page 11 of that section: ''The Acts of Assembly, and Laws, of Virginia p. 11: Chirurgeons. I Anno. 1662. Ch. 92. Any person conceiving the Account of a Chirurgeon or Physician unreasonable, such Chirurgeon &c. shall be compell'd to declare upon Oath in Court, the true Value, Cost, and Quantity of the Drugs administered; which Court shall allow him, with 50 per Cent. advance; and such Consideration for his Care, &c. as they shall judge fit: but if it appears that he has neglected his Patient, he shall be Fined at discretion.''

In 1775, New York enacted its first law setting up a ship quarantine area to curtail the spread of infectious and contagious diseases. (Van Schaak's Law, ch. 973; 3 Colonial Laws of New York 1071.)

In 1760, the New York Colonial Legislature passed an act to restrain quacks practicing in the City of New York which act provided for examination and licensing of physicians and surgeons and provided monetary penalties for practicing without the certification. The preamble of that act follows:

''WHEREAS many ignorant and unskilful Persons in Physick and Surgery in order to gain a Subsistence do take upon themselves to administer Physick and practice Surgery in the City of New York to the endangering of the Lives and Limbs of their Patients; and many poor and ignorant Persons inhabiting the said City who have been persuaded to become their Patients have been great Suffers thereby: For preventing such Abuses for the future, . . .

''BE IT ENACTED. . . .'' (4 Colonial Laws of New York 455, 1180.)

In 1806, the New York State Legislature passed the first medical society act and turned over the examination and licensing of doctors to the profession. The act provided for expulsion of members, if necessary, and that other than grandfather clause practitioners could not thereafter practice unless certified by the society. (Laws of New York, 29th Session, ch. 138, pp. 537-540.)

The term ''any act injurious to the public health'' was a well defined phrase at common law and specifically was

directed toward (1) quarantine violations, and (2) unnecessary operations and unlicensed practice of medicine which had for their motives avarice and greedy expectation of financial gain or other sinister purposes.

It is also persuasive to note that when the first California conspiracy statute (*supra* footnote 2) was initially enacted in 1850 everything, after the initial language relating to commission of any offense, was directed to crimes revolving around fraud, and fraud was obviously one of the sinister purposes for which doctors could have been severely punished under the Duke of York Laws and later colonial laws relating to unlicensed practice of medicine.

Finally, the great concern of government that its citizens must be protected from intentional acts obviously injurious to the public health is reflected in the fact that both the Duke of York Laws and the original California statute were each promulgated or enacted at the very time the respective governments were first being established. In New York right after surrender of the Dutch; in California immediately following the admission of the state.

In *People* v. *Bowman,* 156 Cal.App.2d 784, 792-794 [320 P.2d 70], an information substantially similar to the instant indictment, charging conspiracy to commit acts injurious to the public health and various other crimes, and including seventeen overt acts, was held to be sufficient to inform defendants of the charge against them and that it did not constitute a denial of due process. (See also, *People* v. *Nunn,* 65 Cal.App.2d 188, 191-192 [150 P.2d 476].)

Appellants suggest various other applications of the language "any act injurious to the public health," such as depriving Negroes of adequate housing, selling cigarettes, or playing football in the hot summertime as illustrative of their inability to tell from the indictment what crime they are alleged to have violated. ". . . The rule is well established, however, that one will not be beard to attack a statute on grounds that are not shown to be applicable to himself and that a court will not consider every conceivable situation which might arise under the language of the statute and will not consider the question of constitutionality with reference to hypothetical situations. [Citing cases.] Petitioner has not shown that the statute is being invoked against him in the aspects or under the circumstances which he suggests, and hence may not be heard to complain." (*In re Cregler,* 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305].)

The complaint of appellants that they cannot ascertain from the indictment as to what crime or crimes they are charged with is further answered by *People* v. *Roberts,* 40 Cal.2d 483 [245 P.2d 501]. There the accusation of conspiracy to violate section 11500 of the Health and Safety Code was made. Appellant contended it was insufficient because it did not specify the particular act such as transporting, selling, or possessing a narcotic that was the object of the conspiracy. The court replied (pp. 486-487) : ''It is only required that the pleading be 'in any words sufficient to give the accused notice of the offense of which he is accused.' (Pen. Code, § 952.) Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate (or the grand jury); defendant is entitled to such transcript under section 870 (or section 925) of the Penal Code. [Citations.] . . . The information alleges a single conspiracy with the object of accomplishing one or more types of violation of section 11500, and there was evidence which tends to show that several objects of this single conspiracy were accomplished.''

The purpose of an indictment or information is to inform the accused of the charge which he must meet at the trial. As a part of the accusatory procedure the law now provides that in every case the accused is entitled to a copy of the testimony given before the grand jury, or the committing magistrate, as the case may be. (Pen. Code, §§ 870, 938.1.) The accused is entitled to notice of the offense of which he is charged but not to the particular circumstances thereof, such detail being furnished him by the transcript of the testimony upon which the indictment or information is founded. (See *People* v. *Anderson,* 55 Cal.2d 655, 657 [12 Cal.Rptr. 500, 361 P.2d 32] ; *Callan* v. *Superior Court,* 204 Cal.App.2d 652, 661 [22 Cal. Rptr. 508] ; *People* v. *Mason,* 184 Cal.App.2d 317, 354, 355 [7 Cal.Rptr. 627].)

Here, a timely, complete copy of the transcript of the testimony heard by the grand jury, upon which the indictment accusing defendants was based, was delivered to each defendant. Appellants may not now properly complain that they are entitled to rely upon the verbiage of the indictment alone nor that they were not fully informed well before their trial as to the type and content of the charge they were required to meet. The indictment herein alleges a single conspiracy to unlawfully commit acts injurious to the public health and to violate the code sections and rules therein described. The evidence

shows that several objects of this criminal conspiracy were accomplished.

Appellants next urge that, as a part of the accusatory charge of conspiracy, section 1417 of the Health and Safety Code was erroneously included. The section provides: "Any person who violates any of the provisions of this chapter or of the rules and regulations promulgated under this chapter is guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not to exceed five hundred dollars ($500) or by imprisonment in the county jail for a period not to exceed 180 days or by both such fine and imprisonment." The "chapter" referred to in the section is under division 2 of the code, entitled "Licensing Provisions," and is chapter 2, entitled "Hospitals." The section clearly makes it a misdemeanor to violate any of the provisions of the hospital licensing chapter of the Health and Safety Code. The definition of the corpus of the crime is found in the other sections of the chapter. In addition, this section makes it a crime to violate any of the rules and regulations promulgated under chapter 2.

Appellants do not dispute that they are charged with imputed knowledge of the statutory enactments contained in this chapter and of the promulgated regulations printed in the Administrative Code.

As said in *West Covina Enterprises, Inc.* v. *Chalmers,* 49 Cal.2d 754, 760 [322 P.2d 13]: "Section 1411 of the Health and Safety Code provides: 'The State department . . . shall make . . . reasonable rules and regulations to carry out the purpose of this chapter, classifying hospitals and prescribing minimum standards of safety and sanitation in the physical plant, of diagnostic, therapeutic and laboratory facilities and equipment . . . of hospitals.' The purpose of that section was to enable the Department of Public Health to make rules providing for the safety and sanitation of hospital buildings. . . ."

Clarity of pleading would have been served if section 1411 had been joined with section 1417, Health and Safety Code, in the indictment but the failure to so include may not be held to be seriously prejudicial to the defendants. The Legislature clearly may delegate to an administrative agency the power to make reasonable rules and regulations, and may provide in the enabling legislation that it is a criminal offense to violate such rules and regulations when promulgated. (2 Cal.Jur.2d, 119, Administrative Law, § 56.) Additionally, appellants knew the alleged overt acts and had a copy of the voluminous grand

jury transcript, which gave them further knowledge of the nature of the evidence which the prosecution would produce in court in support of this charge. (See *People* v. *Mason, supra,* 184 Cal.App.2d 317, 354, 355.)

■ At conclusion of the taking of evidence defendants requested that, in addition to forms of general verdict, special verdict forms in behalf of each defendant be submitted for consideration of and determination by the jury. The refusal by the trial judge to submit other than general verdict forms is cited as prejudicial error. We find no merit in this contention.

Penal Code section 1150 provides, in part: "The jury must render a general verdict, except that . . . when they are in doubt as to the legal effect of the facts proved, they may . . . find a special verdict."[5]

The one and only crime with which appellants were charged was conspiracy. (See *Braverman* v. *United States* (1942) 317 U.S. 49, 54 [87 L.Ed. 23, 28, 63 S.Ct. 99].) If the jury found appellants entered into the illegal agreement and the jury unanimously agreed that one of them committed any one of the specified overt acts even though a separate crime was thereby shown to have also been committed, there could remain in the mind of the jury no "doubt as to the legal effect of the facts proved" so as to justify rendition of a special verdict. The only "legal effect of the facts proved" would be that appellants were guilty of conspiracy as charged. On the other hand, if the jury did not find entry into the unlawful agreement plus the overt act, the only "legal effect of the facts proved" would be that appellants were not guilty of conspiracy.

The jury was properly instructed that appellants were charged with entry into an unlawful agreement to violate various state laws and to commit acts injurious to the public health, followed by certain overt acts in furtherance of the

[5]Penal Code section 1150 provides: "The jury must render a general verdict, except that in a superior court, when they are in doubt as to the legal effect of the facts proved, they may, except upon a trial for libel, find a special verdict."

Penal Code section 1151 provides in part: "A general verdict upon a plea of not guilty is either 'guilty' or 'not guilty,' which imports a conviction or acquittal of the offense charged in the accusatory pleading . . . ."

Penal Code section 1152 provides: "A special verdict is that by which the jury find the facts only, leaving the judgment to the court. It must present the conclusions of fact as established by the evidence, and not the evidence to prove them, and these conclusions of fact must be so presented as that nothing remains to the court but to draw conclusions of law upon them."

agreement; that proof of the conspiracy to violate one or more of the laws specified in the indictment would support a conviction; that before a particular defendant could be convicted there had to be unanimous jury agreement as to which particular law such defendant conspired to violate; that before other defendants could be found guilty there had to be unanimous jury agreement that all the defendants found guilty conspired to violate the same law; that before a defendant could be found guilty of the charge of conspiracy, at least one of the overt acts specified in the indictment had to be established beyond a reasonable doubt, and that such overt act must be unanimously agreed upon as to such defendant by all twelve of the jury. They were also instructed on the applicable provisions of each of the laws mentioned in the indictment. The jury having been fully and properly instructed in this connection (See *People* v. *Mason, supra,* 184 Cal.App.2d 317, 370), a general verdict was mandatory under Penal Code section 1150.

 Appellants complain that their rights to freedom from unreasonable search and seizure and from self incrimination were violated as the result of a court-ordered search warrant. They argue that the affidavit for the warrant was insufficient and too general; the evidence obtained thereby should have been suppressed and the receipt into evidence of such material was error.

The true bill was returned June 14, 1962, and count two as amended, upon which the case was tried, was filed August 2, 1962. The affidavit for issuance of the search warrant was filed August 22, 1962, and the warrant was thereupon ordered by the court. The trial was set for September 21, 1962. Probable cause for issuance of the search warrant is shown, and both the affidavit and warrant were timely.

On October 5, 1962, and before the trial commenced, defendants made and argued a motion to quash the search warrant. They were successful in obtaining a court order to quash possession or use of all files and records of Avalon Village Medical Clinic and of Pacific Medical Clinic. The motion was denied as to the files and records of Bixby Knolls Community Hospital, a wholly owned subsidiary of the corporate entity, Metropolitan Enterprises, Inc.

It is clear that none of the appellants have any standing to raise any claims under the Fourth or Fifth Amendments to the United States Constitution with respect to these obviously relevant corporate documents. They cannot successfully con-

tend that any personal privileges are granted by the amendments as regards books and papers of corporations, whether the claim is made on the corporation's behalf or on their own behalf. (*Brovelli* v. *Superior Court,* 56 Cal.2d 524, 529 [15 Cal.Rptr. 630, 364 P.2d 462]; *Wilson* v. *United States* (1911) 221 U.S. 361 [55 L.Ed. 771, 777, 31 S.Ct. 538]; *Oklahoma Press Publishing Co.* v. *Walling* (1946) 327 U.S. 186 [90 L.Ed. 614, 622, 66 S.Ct. 494, 166 A.L.R. 531]; see also, *Hale* v. *Henkel* (1906) 201 U.S. 43 [50 L.Ed. 652, 666, 26 S.Ct. 370].)

Appellants, while acknowledging the foregoing rule, argue that certain of the papers and records retained under the court order and used in evidence were, in fact, the personal property of Rehman and therefore inadmissible. That these were personal and not corporate papers is disputed by respondent. They were admitted as part of the business files and records of Rehman and the corporation which are not constitutionally protected from properly authorized searches and seizures. (*People* v. *Thayer,* 63 Cal.2d 635, 642, 643 [47 Cal.Rptr. 780, 408 P.2d 108].)

Appellants make the further point that the papers and records so seized and offered in evidence could not be constitutionally seized even under a proper warrant authorized by statute because they were merely evidence of crime and not contraband, instruments of crime, or fruits of crime. They cite numerous federal cases in support of their position.

Insofar as this state is concerned, however, our Supreme Court in *People* v. *Thayer, supra,* 63 Cal.2d 635, has held to the contrary, saying (p. 638) : "In California, the mere evidence rule is rejected by statute. (Pen. Code, § 1524, subd. 4.) . . . [P. 639] Federal rules based on the supervisory power of the United States Supreme Court over the administration of justice in the federal courts, . . . are not binding on the states. . . . [P. 642] We hold that the mere evidence rule is not a constitutional standard and has no application in California."

Our United States Supreme Court in *Warden, Maryland Penitentiary* v. *Hayden,* 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642],[6] has now clarified the federal rule as to this subject. Citing *People* v. *Thayer (supra)* with approval, the court said (p. 788 [18 L.Ed.2d]) : "We come, then, to the question whether, even though the search was lawful, the

[6]Decided May 29, 1967.

Court of Appeals was correct in holding that the seizure and introduction of the items of clothing violated the Fourth Amendment because they are 'mere evidence.' The distinction made by some of our cases between seizure of items of evidential value only and seizure of instrumentalities, fruits, or contraband has been criticized by courts and commentators. . . . We today reject the distinction as based on premises no longer accepted as rules governing the application of the Fourth Amendment.''

██ The trial judge properly instructed the jury as to the provisions of section 2141 of the Business and Professions Code.[7] This was followed by the instruction: ''There are several exceptions to Section 2141 of the Business and Professions Code of the State of California that are applicable to this case: (1) It is not unlawful for a licensed registered nurse to administer anesthesia, provided such act is done under the direct supervision and control of a licensed physician. (2) It is not unlawful for a licensed registered nurse to administer injections of drugs or medicines, or to draw blood, provided such acts have been ordered by a licensed physician. (3) It is not unlawful for a licensed laboratory technologist to perform venipuncture or skin puncture for test purposes, provided such acts have been ordered by a licensed physician. (4) It is not unlawful for any person in case of emergency to do any of the acts referred to in Section 2141 of the Business and Professions Code of the State of California. An 'emergency' is defined by Webster's New International Dictionary, 2nd Edition, as: 'An unforeseen combination of circumstances which calls for immediate action.' In other words, 'emergency' anticipates a situation of such nature that action must be taken before a legally authorized person can be found or procured.''

The court then instructed: ''The following activities are within the scope of Section 2141 of the Business and Professions Code of the State of California: (1) Suturing of the skin. (2) Administering anesthesia. (3) Delivering children and cutting the umbilical cord. (4) Ordering X-rays for diagnostic purposes. (5) Ordering pre-operative or post-operative

---

[7]Business and Professions Code section 2141 provides: ''Any person, who practices or attempts to practice, or who advertises or holds himself out as practicing, any system or mode of treating the sick or afflicted in this State, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other mental or physical condition of any person, without having at the time of so doing a valid, unrevoked certificate as provided in this chapter, is guilty of a misdemeanor.''

medication for patients in hospitals. (6) Penetrating the tissue of the human body by an injection of any drug or medicine or to draw blood. By mentioning these activities in this instruction, I do not mean to imply an opinion that the evidence has proved that any of such activities were done by any defendant, nor do I mean to suggest an opinion thereon favorable or unfavorable to either the People or any defendant.

"Insofar as this case is concerned, you are instructed that a licensed physician may lawfully perform any of the acts just mentioned. A licensed registered nurse and a licensed laboratory technologist may lawfully perform some of these acts under certain conditions, as I have previously indicated.

"Except in an emergency, as I have defined the word to you, the performance of any of these acts by a licensed registered nurse or licensed laboratory technologist beyond the scope of his license, or the performance of any of these acts by any other person, would constitute a violation of Section 2141 of the Business and Professions Code of the State of California, even though the act be performed under the supervision, direction and control of a licensed physician." These instructions were correctly given.

Appellants take exception to that portion of the last quoted instruction proscribing an unlicensed person penetrating the tissue of the human body by an injection of any drug or medicine or to draw blood.

It has been established by the following cases that the right to penetrate the human tissue for injection of drugs, medicines, or to draw blood, does not come from the experience or training of the injector. The right to inject is based on the state's interest in protecting the public health. Competency is to be determined by the state, not by the injector's associates, and is evidenced by a license issued by the state. (*People* v. *Nunn*, 65 Cal.App.2d 188 [150 P.2d 476], conspiracy permitting chiropractors to practice medicine, including injection of medicines, without a license; *Magit* v. *Board of Medical Examiners*, 57 Cal.2d 74 [17 Cal.Rptr. 488, 366 P.2d 816], forbidding unlicensed person to administer anesthetics, including spinal injections, even though under supervision of a licensed physician; *Cooper* v. *State Board of Medical Examiners*, 35 Cal.2d 242 [217 P.2d 630, 18 A.L.R.2d 593], forbidding penetrating human tissues in giving blood transfusion by licensed drugless practitioners or licensed

clinical technologist, even though under direction of licensed physician; *Newhouse* v. *Board of Osteopathic Examiners,* 159 Cal.App.2d 728 [324 P.2d 687], forbidding penetrating human tissue by licensed chiropractors by use of suture needle, even though under direction of licensed physician.)

Furthermore, the conspiracy charge goes to the unlawful agreement to permit unlicensed persons to perform medical acts, not to whether the unlicensed persons did actually commit the acts.

■ Appellants contend that the court erred in excluding evidence that several prosecution witnesses had filed lawsuits against defendants after testifying at the trial. They specifically mention three such witnesses. Examination of the record discloses, however, that at least seven other witnesses had filed such suits and defendants were permitted full disclosure thereof on cross-examination. Of the three witnesses named by appellants, the subject of litigation by two of them was brought to the attention of the jury. It appears that possibly as to the witness Mrs. Mercer the record fails to reveal such disclosure. If such be error it appears to be harmless in view of the extensive record as to the subject made by the other prosecution witnesses.

■ Over objection, the prosecution offered the testimony of expert medical witnesses in support of the conspiracy charge and to prove commission by defendants of certain of the overt acts. Some 11 licensed medical physicians were called of which 8 had seen or treated the patients about whom they were to testify. The defendants called some 21 expert medical witnesses, including Rehman.

The prosecution expert testimony was properly received. As the record indicates, testimony of state regulatory officials and certain former employees of the alleged conspirators was first introduced to show the lax procedures and violations of administrative regulations; then the patients (or their parents in the case of children of tender age) testified as to symptoms and treatment rendered. The expert testimony followed.

Qualified doctors, some of whom had examined the patients, then gave their expert opinions on the necessity or medical indications for the surgeries and diagnostic tests performed by the alleged conspirators and their associates. The opinions were based first on hypothetical questions using the patients' medical charts in the hospital files; then on hypothetical questions using the charts and the patients' testimony as to symp-

toms and treatment, excluding Rehman's history and physical examination record. This latter hypothetical questioning was used because of the many instances where Rehman's histories and physicals appeared to have been falsified.

Finally, hypothetical questions were asked of the prosecution experts based upon use of the pathology reports. These reports did not alter the experts' opinion and in most cases strengthened it.

Obviously, if the operation was unnecessary, it, along with all the other unnecessary operations, showed the overt acts done in furtherance of the conspiracy and supported the indictment allegations of conspiracy to injure the public health and to commit other charged offenses such as assault, battery and theft.

Appellants argue that fraud was not proven by such expert testimony. Proof of fraud was not essential to establish the charge of conspiracy to commit acts injurious to the public health. The proof does establish a planned scheme and design to wilfully and unlawfully conspire and agree together and with other persons to commit acts injurious to the public health and to commit certain of the overt acts charged as being in furtherance of that conspiracy.

Appellants raise several further points which we find to be without substance. It was not error to call as witnesses certain of Rehman's patients to show they had been unnecessarily operated upon or that their insurance carriers had fraudulently been deprived of money for operations or services which never should have been performed.

Defendants may not properly complain of the testimony of several women patients that Symes unnecessarily fondled their breasts when taking X-rays, where such evidence was only an incidental part of that offered to demonstrate faulty and incompetent X-ray technique and that excessive X-rays were taken.

 Finally, defendants assert they were denied a speedy trial as guaranteed by the Constitutions of California and of the United States. As said in *Barker* v. *Municipal Court,* 64 Cal.2d 806, 812-813 [51 Cal.Rptr. 921, 415 P.2d 809]: " '[W]hat is a speedy trial in the constitutional sense . . . depends on the circumstances of each case bearing on . . . good cause' for the delay in bringing a defendant to trial. [Citations.] . . .

"The guarantee of a speedy trial 'serves a threefold purpose. It protects the accused . . . against prolonged impris-

onment; it relieves him of the anxiety and public suspicion attendant upon an untried accusation of crime; and . . . it prevents him from being "exposed to the hazard of a trial, after so great a lapse of time" that "the means of proving his innocence may not be within his reach"—as, for instance, by the loss of witnesses or the dulling of memory.' [Citations.]"

No complaint is made by appellants that their case was not promptly and speedily brought to trial, or they suffered a prolonged imprisonment either before or during the trial, or they lost any witnesses. They say they were prejudiced by the fact that the prosecution called too many and unnecessary witnesses to testify against them and the trial took too long.

A review of the voluminous record herein shows no real delays occurred in the continuous progress of the trial. Many witnesses were called by the defense as was their privilege. Much court time was expended in receiving and ruling upon repetitious objections by defense counsel to the admission of prosecution evidence. The trial was ably and impartially conducted by an experienced judge. There is no doubt that a trial of the length here presented establishes hardships on all involved. We find no basis, however, for finding that defendants were not given their full constitutional rights of a speedy and fair trial.

The purported appeals from the order denying a new trial are dismissed. The judgment as to each defendant is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied August 31, 1967, and appellants' petition for a hearing by the Supreme Court was denied September 27, 1967. Mosk, J., did not participate therein. Peters, J., was of the opinion that the petition should be granted.